### Henry Smith v. The State.

#### No. 1842. Decided June 5, 1912.

**1.—Murder—Charge of Court—Manslaughter—Adequate Cause.**

Where, upon trial of murder, the court gave a general definition of manslaughter without applying the same to the facts, and left the question of adequate cause to the jury without instructing them what was adequate cause, the same was reversible error.

**2.—Same—Evidence—Reputation of Deceased—Specific Act—Manslaughter.**

Upon trial of murder, where the defendant had already proved the general reputation of deceased as a quarrelsome man, it was reversible error not to permit the defendant to testify as a witness that he knew of his own knowledge that deceased had stabbed another person; as proof of specific acts of violence committed by deceased on others is admissible if the defendant knew of them prior to the homicide. Following Childers v. State, 30 Texas Crim. App., 160, and other cases.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder in the second degree, his punishment being assessed at five years confinement in the penitentiary.

Quite a number of exceptions are urged to the charge of the court in regard to self-defense and manslaughter. Also that the court erred in charging on the issue of murder in the second degree. It is also contended the evidence is not sufficient to support the conviction of murder in the second degree. The State's case is made by the first witness, Frank Boldin. It is shown the defendant, with others, was engaged in a monte game. Appellant was owner of the monte bank. The witness Boldin was paying off the bets for him and taking in the

money which was won. The deceased was named Ike Portley. Witness says: "Ike bet four bits half and half and Ike loses half of his four bits; I gave Ike a quarter back and Ike snatched it again and says, 'What do you want to take my money for.' Henry Smith was dealing monte. I was paying for him and Ike was betting; he bet four bits half and half, and loses it and I take the four bits and Ike grabbed in the game, taking out a handful of money, and I said, 'Ike, don't take that money,' and Henry started getting up. At that time he was sitting flat down on the ground; when Henry got half way up Ike jumped up right quick, kicked him under the chin and Ike commenced getting up, and Henry still getting up and I was getting the money up and Ike started toward him; I said, 'Ike, let the boy alone,' and Ike came on and I said 'Let him alone,' and Henry got up and backed on off from him about ten steps and I got the money and put it in my pocket, and Ike ran to him and Henry ran his hand back and Ike said, 'Pull it,' and Henry said, 'I am,' and Ike said, 'Pull it you black son-of-a-bitch,' and Henry said, 'I am going to pull it,' and Ike grabbed me, got behind me and stood up behind me, and Henry said 'I am going to shoot,' and he just kept following around; I could not do anything; Ike had me in the back; Ike was holding me and I could not do anything and Henry said, 'Make him turn you loose,' and I said 'Ike, turn me loose,' and Henry said, 'Turn him loose,' and I said 'Ike, turn me loose,' and Ike said, 'I ain't going to do it,' and Henry said, 'If you don't make him turn you loose, I am going to kill you both,' and I was a better man that he was, and I broke loose from him and then the shooting commenced." Deceased was shot in the leg first right above the knee, and the next shot struck him in the groin, and he fell. Appellant fired four more shots. This is the substance of the State's case. In fact this was the only witness used by the State.

Appellant proved by Boone, a city detective, that he knew deceased in his life time, and had known him for three or four years, and stated, in regard to his reputation, that he had heard of him as being a fighting negro, that he was a fighter, and his reputation was bad. The State at this point admitted the reputation of deceased to be bad and that he was a violent and dangerous man. Williams, who was one of the parties present at the game, testified he knew deceased. His testimony is practically the same as the witness Boldin in reference to the game and as to the beginning of the difficulty. He says that appellant gave Portley two bits change, and deceased said, "Give me my money you black son-of-a-bitch" and snatched in the game, and Frank said, "Don't do that fellow, that is my money," and he said, "Don't you like it, you black son-of-a-bitch," and grabbed Henry and kicked him in the jaw, and drew a knife on Henry and Frank Boldin got between them, and said, "Don't do that," and Henry said, "Break loose from that fellow," and Frank got loose and Henry shot Portley and Williams says he ran. At the time appellant shot Portley, Portley

was trying to get to him with his knife the knife was open. According to this witness appellant did not shoot or attempt to shoot until deceased was advancing on him with the knife. Fred Perkins also testified for the defendant, that he was an eyewitness to the transaction, and he described it about as did the other witnesses up to the beginning of the difficulty. He says that at the time deceased reached for the money and grabbed it, defendant said, "Don't grab my money like that," and deceased said, "You black son-of-a-bitch," and kicked him in the chin somewhere," and after he kicked him he opened a big pearl knife, single blade, about that long and made to him, this boy Henry, and Frank grabbed him, Frank Boldin grabbed him, and at that time Henry got up, and after that Henry pulled his gun, he had Frank between him and Henry, Ike had Frank holding him or Frank was holding Ike between Henry, and Ike still had the knife in his hand raised above his shoulder, it was open; he said, 'You get your big pistol, you just got to shoot,' just like that." According to this witness deceased was acting as though he was trying to get a chance to "run in to him (defendant), he was taking a chance to run in to him, had his knife up like that Henry had not shot him before that time."

Appellant testified in his own behalf. He says that he went down to the place where the monte game was, carrying his pistol because a party wanted to buy it from him. The name of the party was Jackson, who told appellant to meet him at the point designated and he would take the pistol. After they got there they engaged in the game, and he was dealing, and Frank Boldin was paying off the bets and taking in the money for him. The trouble came up over a bet as indicated by the other witnesses. They had some rather warm conversation about the matter when deceased called him a black son-of-a-bitch, and asked him if he did not like it, and he said no, and deceased then kicked him and kicked out one of his teeth. He had to have it pulled out the next day. He says that gave him pain and his lip was swollen on account of it. Witness Boldin caught the deceased and told him not to cut him, the defendant, and deceased says, "I will kill him, the black ——" using a very vulgar term. Defendant further testified that deceased had a knife in his hand with a blade about three and one-third inches long, and that Mr. Fife and Mr. Daniels now have the knife. He states that he did nothing until after he was kicked on the jaw; that he was sitting down when deceased kicked him, and got up and backed off, and deceased started towards him with his knife in his hand, stating that he would kill him, the black ——; that deceased was trying to get to him all the time, and tore witness Boldin's shirt off trying to get to him, defendant, and he thought deceased intended to kill him and would have killed him if he had gotten to him, because he had stabbed a couple of white men previous to that. He says he did not shoot deceased until after deceased attempted to cut him, and at the time he did shoot he was coming to him with his

knife. There were some contradictions of some of the witnesses, their statements differing somewhat out of court from those stated in court. It seems that the parties were all friendly and there had been no trouble between them prior to this immediate transaction. Another witness named Charley Boldin testified that he was on his way to the toilet and heard deceased ask defendant for some change, when defendant told him he would give him the change, and deceased snatched the money out of Henry's hands and "hauled off and kicked him in the face and neck here somewhere and ran his hand in his pocket and pulled out a pearl knife and opened it, and Henry, when he staggered back, pulled out a pistol and I broke and run. I did not see any more after that, that is all I know. Frank was sitting in front of Henry when Ike pulled out this knife."

1. The court gave a general charge on manslaughter to the effect that while the provocation must arise at the time of the homicide, yet they could look to all the facts and circumstances to determine the adequate cause as to whether it existed, and whether or not the mind was actuated by passion arising from the cause. This was the only application of the law to the facts of manslaughter. General definitions were given, and among others, it was stated that an assault and battery causing pain and bloodshed would be adequate cause, but this matter was nowhere submitted to the jury. It was simply stated as one of the general definitions. The only application of the law to the facts was as above stated. The charge on manslaughter is not sufficient. Wherever the statute makes a certain thing adequate cause, or certain conditions existed, that is, defined to be adequate cause, and the facts show the existence of it at the time of the difficulty, this must be submitted to the jury, and they must be instructed in regard to the statutory adequate cause. The jury is not authorized to find whether this is adequate cause or not. The statute makes it an adequate cause, and the jury should not only have been told that it was an adequate cause, but they should have been instructed that if the deceased committed an assault and battery upon appellant, producing pain or bloodshed, and this aroused his passion to such an extent as to render the mind incapable of cool reflection, then they should convict him of no higher offense than manslaughter. We wish to state here that the instructions to the jury should be a pertinent application of the law to the facts of the case, and not some general definition of law, or general statement of legal propositions, but it should be a direct application of the law to the facts of the case.

2. There is another question suggested by this record by a bill of exceptions that we desire to notice. While the file mark of the clerk is not placed upon the bill of exceptions, yet it is shown the bill was presented to and approved by the judge on the 9th of January, and court did not adjourn until the 3d of February. This may be an oversight of the clerk or not. Be that as it may, inasmuch as the case will have to be tried again, we desire to call the court's attention to a

matter set up in the bill. It recites that while defendant was testifying in his own behalf, he was asked the following question: "Do you know of your own knowledge of the deceased having cut or stabbed any other person?" to which question counsel for the State objected on the ground that defendant had already proved the general reputation of the deceased, and the court sustained the objection and excluded the testimony. He would have proved had he been permitted to do so, that he knew of his own personal knowledge and from hearsay of several attacks made by deceased Ike Portley on several persons with a knife, and that Ike Portley had stabbed a white man by the name of Morris some time prior to his, deceased's death, and nearly killed the white man, and that he had attacked with a knife several other persons. This testimony was offered for the purpose of showing the defendant's knowledge of the character of the deceased, and further to show that he was being assaulted or about to be assaulted by the deceased with a knife, and by reason of the fear of his own life and taking into consideration the character and the acts of the deceased of assaults on other persons, caused him to act as he did. The court seems to have sustained the State's objection upon the ground that the defendant had already proved the general reputation of deceased, and, therefore, could not prove these specific acts, etc., tendered through himself as a witness. In this we think the court was in error. See Branch's Crim. Law, section 473, for collation of authorities. Mr. Branch in his work on Criminal Law correctly and tersely states the rule and cites the cases. Among other things he states: "Defendant is entitled to introduce in evidence any fact known to him prior to the homicide, hearsay or not, which would go to explain his condition of mind at the time of the homicide and his grounds for apprehension as against his adversary." Dodson v. State, 44 Texas Crim. Rep., 204; Ball v. State, 29 Texas Crim. App., 125. He again states this rule: "Defendant is entitled to have any evidence in fact which tends to prove the good faith of his belief that he believed he was in danger from the deceased." Dodson v. State, 44 Texas Crim. Rep., 204. If self-defense is an issue, defendant may prove anything known to him prior to the homicide about deceased as going to show why defendant acted. Proof of specific acts of violence committed by the deceased on others is admissible if defendant knew of them prior to the homicide, to show who was probably the aggressor, and to show the state of mind of the defendant, and to shed light upon the standpoint of the defendant. Childers v. State, 30 Texas Crim. App., 160; Crow v. State, 48 Texas Crim. Rep., 420; Spencer v. State, 128 S. W. Rep., 122; Poer v. State, 67 S. W. Rep., 500; Russell v. State, 11 Texas Crim. App., 288; Brunet v. State, 12 Texas Crim. App., 521; Spangler v. State, 41 Texas Crim. Rep., 430; Skaggs v. State, 31 Texas Crim. Rep., 564. The quotations above from Mr. Branch's work on Criminal Law, in his tersely stated way, correctly present those ques-

tions, and the authorities are cited to support the proposition. Upon another trial this evidence should be admitted before the jury.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*